IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION | )<br>)<br>) |
| Plaintiff, | )<br>) No. 13 C 2167 |
| v. | )<br>) Judge Virginia M. Kendall |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A" and DOES 1-100, | )<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Deckers Outdoor Corporation filed this suit against the Partnerships and Unincorporated Associations identified on Schedule "A" of the Plaintiff's Complaint and Does 1-100 (collectively the "Defendants") for federal trademark infringement and counterfeiting (Count I), false designation of origin (Count II), cyperpiracy (Count III), and violation of the Illinois Uniform Deceptive Trade Practices Act (Count IV). Plaintiff alleges that the Defendants are using a series of websites and online marketplaces to promote, advertise, market, distribute, offer for sale and sell counterfeit products bearing counterfeit versions trademarks owned by the Plaintiff. Plaintiff seeks entry of an *ex parte* (1) Temporary Restraining Order, (2) Domain Name Transfer Order, (3) Asset Restraining Order, (4) Expedited Discovery Order, and (5) Service of Process by Email and Electronic Publication Order. For the reasons stated herein, the Court grants Plaintiff's Motions.

## BACKGROUND

Plaintiff Deckers manufactures footwear products including the UGG brand of premium sheepskin footwear. UGG products are distributed and sold to consumers through retailers throughout the United States, the www.uggaustralia.com website and UGG Concept Stores, including the Concept Store located at 909 North Rush Street in Chicago, Illinois. Plaintiff acquired the UGG trademark in 1995 and has continuously sold footwear and clothing under the UGG trademark since then. Plaintiff alleges that Defendants are an interrelated group of Chinese-based individuals and business entities working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products bearing counterfeit versions of the UGG trademark. Plaintiff alleges this is accomplished through the use hundreds of interactive commercial websites and online marketplaces and that the Defendants use various tactics to conceal their identities. According to Plaintiff, the websites used by Defendants purport to sell authentic UGG products when in fact these products are low quality "replica" or "fake" versions of UGG products.

Plaintiff's four-count Complaint alleges trademark infringement and counterfeiting (Count I) and false designation of origin (Count II), in violation of the Lanham Act, 15 U.S.C. 1114 and 1125(a), respectively. Plaintiff also alleges a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, et seq. Lastly, Plaintiff seeks injunctive relief under the Anticybersquatting Consumer Protection Act, 15 U.S.C. 1125(d) with respect to those defendants operating domain names incorporating the UGG trademark.

The following Motions are presently before the Court: (1) Plaintiff's Motion for a Temporary Restraining Order against defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of counterfeit UGG Products; (2) Plaintiff's Motion for a

Domain Name Transfer Order temporarily transferring Defendants' domain names to Plaintiff; (3) Plaintiff's Motion for an Asset Restraining Order restricting transfer of Defendants' assets to preserve Plaintiff's rights to an equitable accounting; (4) Plaintiff's Motion for Expedited Discovery Order allowing Plaintiff to inspect and copy Defendants' records relating to the manufacture, distribution, offer for sale and sale of counterfeit UGG products and Defendants' financial accounts; and (5) Plaintiff's Motion for Service of Process by E-Mail and Electronic Publication.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(b) allows for the issuance of an *ex parte* temporary restraining order if (1) "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." The standard for the issuance of a TRO is the same standard that is applied for the issuance of a preliminary injunction. *See, e.g., Crawford & Co. Med. Ben. Trust. v. Repp*, 2011 WL 2531844 (N.D. Ill. June 24, 2011); *The Little Tikes Co. v. Kid Station Toys, Ltd.*, 2008 WL 1805379 (N.D. Ill. Apr. 18, 2008). To obtain a preliminary injunction, a plaintiff must demonstrate (1) a likelihood that it will prevail on the merits of the lawsuit, (2) that it will suffer irreparable harm without injunctive relief, and (3) that there is no adequate remedy at law. *See Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1011 (7th Cir. 2005). "If the moving party fails to demonstrate any one of these three threshold requirements, the court must deny the injunction." *Crawford*, 2011 WL 2531844, *1 (quoting *Grace Christian Fellowship v. KJG Inv. Inc.*, 2009 WL 2460990, at *5 (E.D. Wis. Aug. 7, 2009)).

"If these requirements are met, the court must then balance the degree of irreparable harm to the plaintiff against the harm that the defendant will suffer if the injunction is granted." *Incredible Techs.*, 400 F.3d at 1011; *see also Boucher v. Sch. Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998). The court must apply a sliding scale approach in determining whether to issue a temporary restraining order – the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms needs to be to favor the plaintiff's position. *See TY, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Lastly, the court must consider the public interest (non-parties) in denying or granting the injunction. *See id.* (citing *Storck USA, LP v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

## **DISCUSSION**

### I. **Likelihood of Success on the Merits**

#### A. **Plaintiff's Lanham Act Claims: Counterfeiting and False Designation of Origin**

The Plaintiff has demonstrated a likelihood of success on the merits with respect to both Lanham Act claims. Under the Lanham Act, a defendant is liable for trademark infringement and counterfeiting if the defendant:

> [W]ithout the consent of the registrant … use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a). The Lanham Act further imposes liability upon:

> Any person who, on or in connection with any goods or services … uses in commerce any … false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods … by another person.

15 U.S.C. § 1125(a)(1)(A).

In order to prevail on a claim of trademark infringement and counterfeiting under 15 U.S.C. § 1114(1)(a), or unfair false designation under 15 U.S.C. § 1125(a)(1)(A), a plaintiff must prove two elements. First, the plaintiff must show that "its mark is protected under the Lanham Act." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043 (7th Cir. 2000). Second, the plaintiff must allege that the challenged mark is "likely to cause confusion among consumers." *Id.* The term "counterfeit mark" is defined as either (1) a mark that is registered on the principal register in the United States Patent and Trademark Office's (USPTO) principal register for use on the same goods and services for which the defendant uses the mark, 15 U.S.C. § 1116(d)(1)(B)(i), or (2) "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark," 15 U.S.C.§ 1127; *see also* 15 U.S.C. § 1116(d)(1)(B)(ii). Additionally, in order to be "counterfeit," the defendant must not have been authorized to use the mark at the time the goods and services were manufactured or produced. 15 U.S.C. § 1116(d)(1)(B). In this case Plaintiff has shown that its trademarks are registered with the USPTO and therefore protected and that it has never licensed Defendants to use any of the trademarks.

As for the likelihood that the Defendants' products will cause confusion, the Seventh Circuit has enumerated the following seven factors to determine whether there is a likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's marks; (6) actual confusion; and (7) intent of defendants to palm off their products as that of another. *Eli Lilly & Co. v. Natural Answers, Inc.*,

233 F.3d 456, 461-62 (7th Cir. 2000) (citing *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993)).

Plaintiff has submitted extensive documentation showing that Defendants are selling counterfeit versions of UGG products and that those products are likely to cause confusion regarding the origin of Defendants' products. With respect to the first and second factors, Plaintiff's submissions to the Court make clear that the Defendants are selling low-quality counterfeit products that are otherwise identical or very similar to the Plaintiff's products and that the counterfeit products bear the UGG trademark. With respect to the third factor, although the Defendants do not appear to be selling products through physical retailer stores, they, like the Plaintiff, seek to target consumers and generate sales through the internet. Thus this factor also weighs in favor of the Plaintiff.

The fourth factor also favors a finding that there will be a likelihood of confusion. The consumer base here is a broad and diverse group of individuals. District courts in this circuit have held that where the "relevant class of consumers … consists of internet users" and that "group encompasses the full range of purchasers … not amenable to any broad generalizations regarding sophistication …. the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1043 (N.D. Ill. 2001) (citing *Intermatic Inc. v. Toeppen*, 947 F.Supp. 1227, 1235-36 (N.D. Ill. 1996), and quoting *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 293 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991)). Therefore in this case, the fact that some consumers may be aware that they are purchasing "knockoff" products is of little consequence because "less knowledgeable consumers may draw different conclusions." *Id.* Adding to the risk of confusion is the fact that Defendants' products are not

sold at deep, "too good to be true," discounts but rather are sold at prices that are only slightly below the retail price for authentic UGG products. This pricing scheme increases the likelihood that consumers will be misled to believe that they are receiving a bargain on authentic UGG products.

The fifth factor, the strength of the marks, also weighs in favor of the Plaintiff. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli Lilly*, 233 F.3d at 464 (quotation and citations omitted). In this case, UGG products have been sold for years by authorized retailers and UGG Concept Stores. They are sold through Deckers' official UGG website, www.uggaustralia.com. In addition to their presence both online and in various retailers, UGG products have received widespread media coverage in both printed media and on television. Based on the above, the Court finds that Plaintiff has demonstrated that UGG products are distinctive and that goods sold under the mark have a tendency to be identified as emanating from Deckers.

Plaintiff offers no evidence of actual confusion and argues instead that actual confusion can be inferred because Defendants are selling near-identical counterfeit versions of UGG products that use the same UGG trademark. "[T]he lack of any such evidence is neither surprising nor fatal to [Plaintiff's] motion" at this stage in the litigation. *Trans Union LLC*, 142 F.Supp.2d at 1043 (addressing motion for preliminary injunction) (citing *Eli Lilly*, 233 F.3d at 464-65). Furthermore, such evidence is not required to prove that a likelihood of confusion exists, particularly given the compelling evidence that Defendants are attempting to "palm off" their goods as genuine UGG merchandise. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001).

Furthermore, Defendants' websites pose the risk of "initial interest confusion." *Id.* (citing *Eli Lilly*, 233 F.3d at 464-65). As one district court in this circuit has explained:

> On the internet, initial interest confusion occurs when customers seeking a particular website are diverted by allegedly infringing domain names and metatags to a competing website, and then 'realize that the site they have accessed is not the one they were looking for,' but nevertheless 'decide to use the offerings of the infringing site.'

*Id.* (quoting *Network Network v. CBS, Inc.*, 2000 WL 362016, at *8 (C.D. Cal. Jan. 18, 2000), and citing *Brookfield Comm'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062-65 (9th Cir. 1999)). Here, consumers who may genuinely intend to search for and purchase UGG products may find themselves on one of Defendants' online marketplaces for counterfeit goods. Even if these consumers learn before making their purchase that the website is not owned or operated by Plaintiff, such users may end up deciding to purchase the Defendants' products at the slightly reduced prices.

The last factor concerns whether the Defendants intended to palm off their own products as those of the Plaintiff. Given the Defendants' use of identical trademarks, meta data, and near-identically designed products, it is apparent that the Defendants intended to confuse and deceive the consuming public into thinking that their products were manufactured by or emanate from Plaintiff. In this way, Defendants are intentionally benefitting from Deckers' good will and reputation. Therefore the seventh and final factor weighs in favor of the Plaintiff.

Accordingly, the Court finds that Plaintiff has shown a likelihood of success on the merits of its Lanham Act claims by demonstrating that it possesses the exclusive rights to a protected trademark and that the Defendants' activities are likely to cause confusion regarding the origin of products sold on Defendants' websites.

### B. Plaintiff's Cyberpiracy Claim

Plaintiff has also sued Defendants for cyberpiracy in violation of the Anticybersquatting Consumer Protection Act of 1996 ("ACPA"). Under the ACPA, a person alleged to be a cybersquatter is liable to the owner of a protected mark, "without regard to the goods or services of the parties," if that person (1) "has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section;" and (2) registers, traffics in, or uses a domain name that is identical or confusingly similar to or dilutive of a mark that is distinctive or famous. *See* 15 U.S.C. § 1125(d)(1)(A). The ACPA was enacted, in part, to address counterfeit sellers who "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004) (quoting S.Rep. No. 106-140, at 5-6).

Plaintiff has demonstrated a likelihood of success on its ACPA claim. Specifically, Plaintiff has established that the UGG mark is inherently distinctive and famous and that consumers identify the UGG trademark with Plaintiff's high quality products. Plaintiff has also demonstrated that many of the domain names used by Defendants (*see* Sealed Exhibit A), are identical or confusingly similar to Plaintiff's own domain name, www.uggaustralia.com. In fact, many of the Defendants' domain names listed in Schedule A incorporate the "UGG" name in its entirety.

The ACPA provides that in determining whether a defendant acted in bad faith, the court may consider (but is not limited to) nine factors. These factors are (1) the trademark or other intellectual property rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly

used to identify that person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the same time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (9) the extent to which the mark incorporated the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section. 15 U.S.C. § 1125(d)(1)(B).

Nearly every factor from the statute that is relevant in this case weighs in favor of a finding that the Defendants acted in bad faith. With respect to the first factor, the Defendants do not have any trademark or other intellectual property rights in domain names that are nearly identical or confusingly similar to the Plaintiff's domain name. As for the second, third, and

fourth factors, there is no indication that the domain names similar to UGG resemble the actual legal name of any of the Defendants, nor does it appear that the Defendants have previously used such domain names in connection with the bona fide fair, noncommercial, or commercial sale of goods or services. With respect to the fifth factor, it is apparent from legitimate appearance of the Defendants' online marketplaces, the similarity between the counterfeit products and authentic UGG products, and the Defendants' use of Plaintiff's product descriptions, logos, and search engine optimization tools that Defendants intend to divert consumers from Plaintiff's authentic domain name to its own marketplaces for financial gain. The seventh factor also weighs in favor of a finding that Defendants acted in bad faith. Plaintiff has shown that the individuals who register the domain names to sell counterfeit UGG products use misleading and false contact information by adding characters to their names and leaving out crucial portions of their address. With respect to the eighth factor, Sealed Schedule A makes clear that several Defendants have registered for and acquired numerous domain names that are nearly identical and confusingly similar to Plaintiff's famous and distinctive mark. As noted above, many of the Defendants' domain names listed in Schedule A incorporate the "UGG" name in its entirety.

    C.    **Plaintiff's UDTPA Claim**

Plaintiff has also demonstrated a likelihood of success on the merits with respect to its UDTPA claim. Under the UDTPA, a defendant is liable for, among other things, (1) passing off goods as those of another; (2) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; and (3) causing a likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with another. 815 Ill. Comp. Stat. 510/2(a). Where, as here, the "plaintiff's factual allegations under the UDTPA also form the basis for the plaintiff's claim under the Lanham Act, the legal inquiry is the same under

11

both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *SB Designs v. Reebok Int'l, Ltd.*, 338 F.Supp.2d 904, 914 (N.D. Ill. 2004) (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)).

Accordingly, in this case Plaintiff's UDTPA claim against Defendants "must rise and fall based on the Lanham Act claim." *Dynamic Fluid Control Ltd. v. Int'l Valve Manuf., LLC*, 790 F.Supp.2d 732, 739 (N.D. Ill. 2011) (quoting *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F.Supp.2d 922, 929 (N.D. Ill. 1998)). Based on the above finding that Plaintiff has sufficiently demonstrated a likelihood of success on the merits of its counterfeiting and false designation claims, the Court finds that Plaintiff has also demonstrated a likelihood of success on the merits of its UDTPA claim.

## II. Likelihood of Irreparable Harm & Adequate Remedy at Law

Plaintiff correctly points out that the Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) (citing *Eli Lilly*, 233 F.3d at 469, *Meridian Mut. Ins. Co.*, 128 F.3d 1111, 1114 (7th Cir. 1997), and *Wesley-Jessen Division of Schering Corp.*, 698 F.2d 862, 867 (7th Cir. 1983)). The Seventh Circuit has also stated that irreparable injury "almost inevitably follows" where there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Ind., Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977); *see also Promatek Ind., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) ("[I]t is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss.") (citing

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992)). This is because "the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control he nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.* (quoting *Int'l Kennel Club of Chicago, Inc. v. Might Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988).

Here, as long as Defendants continue to use UGG marks, logos, and product descriptions to sell products purporting to be authentic UGG products, Plaintiff will have no control over the quality of goods that enter the market bearing UGG marks. In the absence of a restraining order, Plaintiff will continue to be harmed irreparably through damage to its goodwill, brand confidence, and reputation. The likelihood of this type of harm is a proper basis for finding that there is no adequate remedy at law. *See Promatek*, 300 F.3d at 813 (due in part to "the difficulty in assessing the damages associated with a loss of goodwill, the district court was correct in finding that [Plaintiff] lacked an adequate remedy at law"); *Gateway Eastern Railway Co. v. Terminal Railroad Assoc. of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[S]howing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages.") In addition, the presence of hundreds of websites selling identical products will undoubtedly result in a loss of exclusivity over the sale of products bearing the UGG mark and a loss of future sales.

### III. Balancing of Harms/Public Interest

Because Plaintiff has met the threshold requirements necessary for the Court to grant its request for a preliminary injunction, the Court must assess whether the balance of harms favors the Plaintiff or whether the harm to the Defendants or the public interest is sufficiently weighty

that the injunction should be denied. In balancing the harms between Deckers and the Defendants, the Court applies a "sliding scale: [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Girl Scouts of Manitou Council v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). For reasons discussed above, Plaintiff has demonstrated a strong likelihood of prevailing on the merits. This leaves Defendants with a proportionately small chance of showing that they have any right to sell or market counterfeit UGG merchandise. Plaintiff has also shown that the Defendants in this case have and continue to willfully infringe its registered trademarks by using deceptive tactics that lure customers to their several websites and render it difficult to identify and locate the Defendants. Such individuals are entitled to very little equitable consideration, especially in light of the continuing harm incurred by the Plaintiff. *See, e.g., Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Ind. Ass'n*, 929 F.Supp.473, 478 (D.D.C. 1996) (balancing of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark"). On the other end of the scale, the harm that would be incurred by the Plaintiff is significant because without a restraining order, the Defendants "would continue to attract consumers browsing the web by using [Plaintiff's] trademark, thereby acquiring goodwill that belongs to [Plainiff]." *Promatek*, 300 F.3d at 813. As noted above, "damage[s] occasioned by trademark infringement are by their very nature irreparable" because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Int'l Kennel Club*, 846 F.2d at 1092; *Abbott Labs.*, 971 F.2d at 16; *see also In re Aimster Copyright Litigation*, 334 F.3d 643, 656 (7th Cir. 2003) (balancing of harms weighed in favor of

plaintiff because monetary damages could not easily be estimated and might ultimately prove impossible to recover). Accordingly, the balance of equities weighs in favor of the Plaintiff.

The Seventh Circuit stated long ago that "the trademark laws … are concerned not alone with the protection of a property right existing in the individual, but also with the protection of the public from fraud and deceit." *Stahly, Inc. v. M.H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950). In trademark infringement cases, "the relevant consideration in determining whether the public interest will be disserved by the grant of an injunction is the consumer's interest in not being deceived about the products they purchased." *Int'l Kennel Club*, 846 F.2d at 1092 n. 8 (quoting *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1988)). Here the availability of counterfeit UGG products on Defendants' online marketplaces creates a likelihood that consumers will be misled to believe that the products sold on Defendants' websites are produced by or emanate from the Plaintiff. In trademark infringement cases such as this "the public interest is served by [an] injunction because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly*, 233 F.3d at 469. Therefore the Court finds that the public interest would not be disserved by the issuance of a temporary restraining order. *See id* (district court "adequately addressed the impact of the injunction on the public interest and was well within its discretion in concluding that it would not be disserved" where "there was a likelihood of confusion among the public as to whether the plaintiff sponsored or was otherwise affiliated with the defendants' products"). Accordingly, a temporary restraining order is appropriate in this case because Plaintiff has shown that it is likely to succeed on the merits of its claims and the balance of harms weighs in its favor.

## IV. Relief Sought

In addition to a temporary restraining order, Plaintiff seeks (1) an Order transferring the Defendants' domain names to Plaintiff's control, (2) an Order preventing the fraudulent transfer of assets, and (3) an Order allowing service of process by e-mail and electronic publication. This Court agrees with the several other courts in this district that have found such relief appropriate in similar cases. *See, e.g., Oakley, Inc. v. Does 1-100*, No. 12-cv-9864 (N.D. Ill. Dec. 14, 2012) (Dow, J.) (granting *ex parte* application for temporary restraining order including the transfer of domain names, freezing of Defendants' financial accounts, and service of process by electronic publication and electronic mail); *True Religion Apparel, Inc. v. Does 1-100*, No. 12-cv-9894 (N.D. Ill. Dec. 20, 2012) (Coleman, J.) (same); *Tory Burch LLC v. Zhong Feng, et al.*, No. 12-cv-9066 (N.D. Ill. Nov. 15, 2012) (Bucklo, J.) (same); *Coach, Inc., et al v. Does 1-100*, No. 12-cv-8963 (N.D. Ill. Nov. 15, 2012) (Bucklo, J.) (same); *Tory Burch LLC v. Does 1-100*, No. 12-cv-07163 (N.D. Ill. Sep. 14, 2012) (Lee, J.) (same). Absent a transfer of domain names to the Plaintiff, the Defendants in this case may be able to evade the Court's restraining order by changing ownership of the domain name and continuing to operate their online marketplaces while this case is pending. The freezing of financial assets is also appropriate in this case because Defendants may otherwise transfer their financial assets to overseas accounts, thereby depriving the Plaintiff of final relief. *See Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) ("[B]ecause the Lanham Act authorizes the district court to grant [plaintiff] an accounting of [defendant's] profits as a form of final equitable relief, the district court had the inherent power to freeze [the defendant's] assets in order to ensure the availability of that final relief."); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("A request for equitable relief invokes the district court's inherent equitable powers

to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief."); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("[S]ince the assets in question … were profits of the [defendants] made by unlawfully stealing [the plaintiffs'] services, the freeze is appropriate and may remain in place pending final disposition of this case."). Lastly, allowing for service via e-mail and electronic publication is appropriate in this case because (1) Defendants have provided false names and physical address information in their domain names in order to conceal their location and avoid liability for their unlawful conduct, (2) Defendants rely primarily on electronic communications to communicate with their registrars and customers, demonstrating that electronic service would be a reliable means of apprising the Defendants of this case, and (3) Plaintiff is unable to determine the exact physical whereabouts or identifies of the registrants of the domain names being used to operate Defendants' online marketplaces.

Plaintiff also seeks an *ex parte* Order allowing expedited discovery to discover bank and payment system accounts Defendants use for their alleged counterfeit sales operations. Plaintiff explains that the purpose of this discovery is to identify additional financial accounts used by the Defendants so that those accounts can be frozen in order to contain the Defendants' activities. Federal Rule of Civil Procedure 26(d) explains that parties may generally serve discovery only after a Rule 26(f) conference, "except … when authorized by … court order." Fed.R.Civ.P. 26(d)(1). To determine whether to authorize expedited discovery in a particular case, courts generally apply a "good cause" standard. *See* Fed.R.Civ.P. 26(b)(1) ("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). In this case there is good cause to allow for expedited discovery. Because the Defendants in this case are located overseas and have gone to great lengths to conceal their identities and avoid

detection, it is likely that this Court's restraining order would be of little value if the Plaintiff is unable to discover the Defendants' bank accounts and serve the financial institutions maintaining those accounts.

Lastly, Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue … a temporary restraining order only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Given the Plaintiff's strong likelihood of success, the Court finds the proper amount of security in this case is $10,000 dollars.

## CONCLUSION

For the reasons stated above, Plaintiff's Motions for a temporary restraining order, domain name transfer order, asset restraining order, expedited discovery order, and service of process by e-mail and electronic publication order are granted consistent with this Court's signed Order.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 27, 2013